UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MAREK ROSS,

                             Plaintiff,

v.                                              1:12-CV-1006
                                              (GTS/CFH)

NIRAV SHAH, in his official capacity as Comm'r
of the New York State Dep't of Health;[1] and
ANDREW CUOMO, in his official capacity as
Governor of the State of New York,

                            Defendants.
_____

APPEARANCES:                          OF COUNSEL:

DISABILITY RIGHTS NEW YORK         CHRISTINE S. WATERS, ESQ.
   Counsel for Plaintiff                      JENNIFER J. MONTHIE, ESQ.
725 Broadway, Suite 450
Albany, New York 12207

HON. ERIC T. SCHNEIDERMAN          BRUCE J. BOIVIN, ESQ.
Attorney General of the State of New York    Assistant Attorney General
   Counsel for Defendants
The Capitol
Albany, New York 12224-0341

GLENN T. SUDDABY, United States District Court

---

[1]      Defendants argue that, because Commissioner Nirav Shah resigned on May 4, 2014, and has been replaced by Acting Commissioner Howard Zucker, Acting Commissioner Zucker should be substituted as a party for Commissioner Shah (who is sued only in his official capacity), pursuant to Fed. R. 25.  (Dkt. No. 86, Attach. 7, at 3, n.1 [attaching page "1" of Defs.' Opp'n Mem. of Law].)  Plaintiff does not object to this substitution.  (*See generally* Dkt. No. 88 [Plf.'s Reply Memo. of Law].)  Because Defendants' request is supported by a showing of facial merit, <u>the Clerk of the Court is directed to substitute Acting Commissioner Howard Zucker for Commissioner Nirav Shah on the docket sheet.</u>

## DECISION and ORDER

Currently before the Court, in this disability rights action filed by Marek Ross ("Plaintiff") against New York State Department of Health Commissioner Nirav Shah and New York State Governor Andrew Cuomo ("Defendants"), are the parties' cross-motions for summary judgment. (Dkt. Nos. 83, 86.) For the reasons set forth below, Plaintiff's motion is denied, and Defendants' cross-motion is granted.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint

Generally, in his Complaint, Plaintiff, a former recipient under the New York State Traumatic Brain Injury Medicaid Waiver Program ("TBI Waiver Program"), alleges that his due process rights were violated when he was transferred from community housing in Cohoes, New York, to the Holyoke Rehabilitation Center in Holyoke, Massachusetts ("HRC") in 2009, and that he has been discriminated against (as a person with a disability), by being improperly segregated from society at HRC. (Dkt. No. 1.)

Based on these factual allegations, Plaintiff asserts six claims: (1) a claim that Defendants have subjected Plaintiff to "unnecessary and unjustified segregation" through their "criteria and methods of administering New York's TBI Waiver Program," in violation of Title II of the Americans with Disabilities Act ("ADA"); (2) a claim that Defendants have failed to "administer services[,] programs and activities [to Plaintiff] in the most integrated setting appropriate for the needs of a qualified individual[] with disabilities," and have failed to "provide opportunities for [Plaintiff] to transition to increased independence," in violation of the ADA; (3) a claim that the Defendants have effectively "subject[ed] Plaintiff . . . to discrimination" through the Department

of Health's "methods of administration of the Department of Health and New York's Medicaid program," in violation of the ADA; (4) a claim that Defendants have denied Plaintiff "access to existing community programs and . . . requir[ed] that [he] be confined in the segregated institutional setting in order to receive needed rehabilitative and supportive services," in violation of Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"); (5) a claim that Defendants have violated Plaintiff's due process rights in conjunction with his transfer to HRC and his termination from the TBI Waiver Program, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983; and (6) a similar due process claim under Article I, Section 6 of the New York State Constitution. (*Id.*)

### B. Procedural History

Because this Decision and Order is intended primarily for the review of the parties, the Court will not recite this action's procedural history other than to note that, while Plaintiff's Complaint also asserts allegations and claims against HRC, Maria Relyea (a Regional Resource Development Specialist or "RRDS"), and Sunnyview Rehabilitation Hospital (the Capital Region Regional Resource Development Center or "RRDC"), he settled those claims before filing his motion for summary judgment. (Dkt. No. 62 [Stipulation and Order filed Sept. 9, 2014]; Dkt. No. 85 [Stipulation and Order filed Jan. 16, 2015].)

### C. Parties' Arguments on Their Cross-Motions

Generally, in support of his motion, Plaintiff asserts two arguments. (Dkt. No. 83, Attach. 3 [Plf.'s Memo. of Law].) First, Plaintiff argues that his alleged segregation from society by being moved to HRC constitutes discrimination prohibited by the ADA and its implementing regulations for the following reasons: (a) Plaintiff is a qualified person with a disability; (b)

3

community placement is appropriate and Plaintiff does not oppose it; (c) because New York State disclaims the duty to even plan for Plaintiff's discharge, it has no affirmative defense; and (d) community placement is not a fundamental alteration. (*Id*.) Second, Plaintiff argues that Defendants have admitted all matters asserted in Plaintiff's Request for Admissions under Fed. R. Civ. P. 36 (dated November 6, 2014). (*Id*.)

Generally, in opposition to Plaintiff's motion, and in support of their own cross-motion, Defendants assert three arguments. (Dkt. No. 86, Attach. 7 [Defs.' Opp'n Memo. of Law].) First, Defendants argue that Plaintiff's procedural due process claims against Defendants must be dismissed for the following reasons: (a) with regard to Plaintiff's fifth claim (for a violation of due process under the Fourteenth Amendment), Defendants are protected from liability as a matter of law by sovereign immunity under the Eleventh Amendment; (b) the Eleventh Amendment also bars claims against the State based upon violations of state law (such as Plaintiff's sixth claim, for violation of due process under the New York State Constitution); and (c) in any event, Plaintiff's procedural due process claims (both federal and state) are barred by the availability of a proceeding under Article 78 of the New York Civil Practice Law and Rules (which constitutes a meaningful post-deprivation remedy). (*Id*.) Second, Defendants argue that they are entitled to summary judgment on Plaintiff's ADA and Rehabilitation Act claims for the following reasons: (a) the State's treatment professionals have consistently determined that Plaintiff cannot be served safely in the community (resulting from, *inter alia*, his involvement in 13 Serious Reportable Incidents, which included a threat to kill staff, two expressions of suicidal ideation, an assault on staff, an elopement from staff, a threat to harm himself, and an allegation of being discovered in a bush with a ten-year-old girl); (b) contrary to Plaintiff's "eleventh hour

ambiguous affidavit," Plaintiff in fact opposed the treatment plan in December 2014 (because he did not want to live with mentally ill people); and (c) placement cannot be reasonably accommodated at this time due to the limited resources available to New York State and the needs of others with mental disabilities. (*Id.*) Third, Defendants argue that the Requests for Admission are not enforceable for the following reasons: (a) Plaintiff's service of his Requests for Admission on November 10, 2014, was not timely because (i) the deadline for such service was 30 days before November 14, 2014, and (ii) the magistrate judge's Order of November 18, 2014, did not, *nunc pro tunc*, extend that service deadline (but rather expressed an agreement to consider extending the "discovery deadline") and, in any event, (iii) the magistrate judge's Order of December 3, 2014, extended the "discovery deadline" to December 12, 2014, "for the **sole purpose** of completing State defendants depositions" (emphasis in original); and (b) in any event, the Requests for Admission did not contain requests to admit facts, but requests to admit the case's fundamental legal issues, which have been "fully contested throughout this litigation." (*Id.*)

Generally, in reply to Defendants' opposition to his motion, and in opposition to Defendants' cross-motion, Plaintiff asserts six arguments. (Dkt. No. 88 [Plf.'s Reply Memo. of Law].) First, Plaintiff argues, he does not oppose the withdrawal of the fifth and sixth claims asserted in his Complaint. (*Id.*) Second, Plaintiff argues, Regional Resource Development Specialists are not "state treatment professionals" within the meaning of *Olmstead v. L.C. ex. rel. Zimring*, 527 U.S. 581 (1999). (*Id.*) Third, Plaintiff argues, his treating professionals at HRC have determined that he would benefit from community placement. (*Id.*) Fourth, Plaintiff argues, while he has expressed reluctance or ambivalence about moving to the community in

discussions with RRDS assessors, he does not oppose placement in the community. (*Id*.) Fifth, Plaintiff argues, Defendants' failure to follow the application process for the TBI Waiver Program results in Plaintiff's unnecessary institutionalization. (*Id*.) Sixth, Plaintiff argues, community placement is not a fundamental alteration to New York State's services and supports. (*Id*.)

**D.    Statements of Material Fact**

**1.    Statement of Material Facts Relevant to Plaintiff's Motion**

Generally, the following statements of fact are asserted and supported by a specific record citation in Plaintiff's Statement of Material Facts ("Rule 7.1 Statement") and not denied with a specific record citation in Defendants' response thereto ("Rule 7.1 Response").[2]

1.    Plaintiff, Marek Ross, is a person with a traumatic brain injury and several mental health diagnoses.[3]

2.    He is a person with a disability within the meaning of the Americans with Disabilities Act.

3.    He demonstrates impairment in frontal executive subsystem functions, including

---

[2]    The Court notes that Plaintiff has submitted a reply to Defendant's Rule 7.1 Response. (Dkt. No. 88, Attach. 8.) However, such a reply is not permitted by either Local Rule 7.1(a)(3) or Fed. R. Civ. P. 56(c). As a result, it will be ignored.

[3]    (*Compare* Dkt. No. 83, Attach. 1, at ¶ 1 [Plf.'s Rule 7.1 Statement, asserting fact and supporting assertion with citation to Waters Decl., Exhibit B, at 23, stating that Plaintiff "demonstrates extreme elevation on the Somatization, Obsessive Compulsive and Anxiety Scales. He shows only mild elevation on the Depression Scale"] *with* Dkt. No. 86, Attach. 5, at ¶ 1 [Defs. Rule 7.1 Response, denying fact as originally written, but citing to Kosinski Decl., Exhibit I, stating that Plaintiff is diagnosed with the "Axis I" mental health disorders of "Schizoaffective Disorder," "Obsessive Compulsive Disorder," "Polysubstance Abuse," and "Bipolar Disorder," and an "Axis II" mental health disorder of "R/O Mixed Personality Disorder"].)

problems with planning and problems with nonverbal concept formation, mental set switching, and set maintenance.[4]

4.      On September 12, 2012, his cognition was evaluated as mildly to moderately impaired, especially with regard to executive and spatial functions.[5]

5.      He has several mental health diagnoses.[6]

6.      On the Independent Living Scales Test administered by Dr. Lifrak during her comprehensive neuropsychological evaluation, Plaintiff's "weakest area [was] in terms of Health and Safety."[7]

7.      Plaintiff has resided at HRC, in Holyoke, Massachusetts since September 18, 2009.

8.      HRC is a skilled nursing facility.

---

[4]      (*Compare* Dkt. No. 83, Attach. 1, at ¶ 3 [Plf.'s Rule 7.1 Statement, citing Waters Decl., Exhibit B, at 19, stating above fact] *with* Dkt. No. 86, Attach. 5, at ¶ 3 [Defs. Rule 7.1 Response, citing Waters Decl., Exhibit B, at 19, stating above fact].)

[5]      (*Compare* Dkt. No. 83, Attach. 1, at ¶ 4 [Plf.'s Rule 7.1 Statement, citing Waters Decl., Exhibit F, at 87, establishing above fact] *with* Dkt. No. 86, Attach. 5, at ¶ 4 [Defs. Rule 7.1 Response, citing Waters Decl., Exhibit F, at 87, establishing above fact].)

[6]      (*Compare* Dkt. No. 83, Attach. 1, at ¶ 5 [Plf.'s Rule 7.1 Statement, asserting fact and supporting assertion with citation to Waters Decl., Exhibit I, stating that Plaintiff is diagnosed with the "Axis I" mental health disorders of "Schizoaffective Disorder," "Obsessive Compulsive Disorder," "Polysubstance Abuse," and "Bipolar Disorder," and an "Axis II" mental health disorder of "R/O Mixed Personality Disorder"] *with* Dkt. No. 86, Attach. 5, at ¶ 5 [Defs. Rule 7.1 Response, denying fact but citing to Kosinski Decl., Exhibit I, and Waters Decl., Exhibit I (both copies of the same document), stating that Plaintiff is diagnosed with the "Axis I" mental health disorders of "Schizoaffective Disorder," "Obsessive Compulsive Disorder," "Polysubstance Abuse," and "Bipolar Disorder," and an "Axis II" mental health disorder of "R/O Mixed Personality Disorder"].)

[7]      (*Compare* Dkt. No. 83, Attach. 1, at ¶ 6 [Plf.'s Rule 7.1 Statement, citing Waters Decl., Exhibit B, at 20, stating above fact] *with* Dkt. No. 86, Attach. 5, at ¶ 6 [Defs. Rule 7.1 Response, citing Waters Decl., Exhibit B, at 20, stating above fact].)

9. Plaintiff is a New York State resident who receives New York State Medicaid.

10. New York State uses Medicaid funds to pay for Plaintiff's stay in HRC, a nursing home.

11. On or about January 22, 2010, HRC determined that Plaintiff, "with appropriate community housing, service and supports, could be discharged from HRC because he could handle and benefit from a community-based setting."[8]

12. Over the years, HRC made referrals to, and pursued several discharges from, New York State programs on Plaintiff's behalf, which were unsuccessful.[9]

13. Licensed Nursing Home Administrator, Mark Partyka, of HRC stated that Plaintiff's "Needed Services included services that would be funded by New York State's Traumatic Brain Injury (TBI) Wa[i]ver." After "complet[ing] a comprehensive neuropsychological evaluation" of Plaintiff, Dr. Maria Lifrak stated that Plaintiff "would be more appropriately placed in a community setting receiving a combination of TBI Waiver services and group and individual psychotherapy." Barry Dain–a health care administrator, employed at Sunshine Home Care in New York State–"determined that Marek Ross required a plan of care combining supports from the New York State Department of Health TBI Waiver program in conjunction with state plan services . . . ."[10]

---

[8] (*Compare* Dkt. No. 83, Attach. 1, at ¶ 11 [Plf.'s Rule 7.1 Statement, citing portion of record establishing above facts] *with* Dkt. No. 86, Attach. 5, at ¶ 11 [Defs. Rule 7.1 Response, failing to cite record evidence controverting above facts].)

[9] (*Compare* Dkt. No. 83, Attach. 1, at ¶ 12 [Plf.'s Rule 7.1 Statement, citing portions of record establishing above facts] *with* Dkt. No. 86, Attach. 5, at ¶ 12 [Defs. Rule 7.1 Response, failing to cite record evidence controverting above facts].)

[10] (*Compare* Dkt. No. 83, Attach. 1, at ¶ 13 [Plf.'s Rule 7.1 Statement, citing portions of record establishing above facts] *with* Dkt. No. 86, Attach. 5, at ¶ 13 [Defs. Rule 7.1 Response, failing to cite record evidence controverting above facts].)

14. On or about January 22, 2010, HRC determined that Plaintiff, with appropriate community housing, services and supports, could be discharged from HRC because he could handle and benefit from a community-based setting. During her comprehensive neuropsychological evaluation, Dr. Lifrak determined that Plaintiff "would be more appropriately placed in a community setting receiving a combination of TBI Waiver services and group and individual psychotherapy."[11]

15. In an affidavit dated January 14, 2015, Plaintiff states that he "seek[s] to return to New York State and live in the community."

16. Medical professionals have identified specific services that would meet Plaintiff's needs in a community-based setting.[12]

17. These services include the following:

(a) supportive community-based housing;

(b) Service Coordination/ Intensive Case Manager;

(c) Positive Behavioral Interventions and Supports;

(d) Independent Living Skills Training;

(e) Mental Health Day Treatment Services;

(f) individual and group psychotherapy; and

(g) primary care physician.

---

[11] (*Compare* Dkt. No. 83, Attach. 1, at ¶ 14 [Plf.'s Rule 7.1 Statement, citing portions of record establishing above facts] *with* Dkt. No. 86, Attach. 5, at ¶ 14 [Defs. Rule 7.1 Response, failing to cite record evidence controverting above facts].)

[12] (*Compare* Dkt. No. 83, Attach. 1, at ¶ 16 [Plf.'s Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 86, Attach. 5, at ¶ 16 [Defs. Rule 7.1 Response, denying fact but failing to support denial with accurate record citation].)

18. Either New York State's Medicaid program or TBI Waiver Program pays for each of the services identified for Plaintiff; and other New York State Medicaid recipients have received, and are receiving, such services.

<u>Supportive Community-Based Housing</u>

19. The New York State Office for Mental Health licenses and funds community-based mental health residential programs which are administered through County Departments of Community Mental Health.

20. The process for applying for a community-based mental health residential program is through a Single Point of Access ("SPOA") application.

21. New York State Office for Mental Health licenses and funds Continuing Day Treatment Programs.

22. Plaintiff has applied for community-based mental health housing through a SPOA application to Westchester County on or about March 4, 2014.

23. On or about July 2, 2014, Plaintiff was notified that his SPOA application was approved.

24. On or about September 17, 2014, Search for Change contacted HRC about a possible opening for Plaintiff in its supported housing program, pending an evaluation with its staff.

25. On October 7, 2014, Plaintiff visited Search for Change for an evaluation and assessment.

26. Search for Change states that it will not admit Plaintiff to Office of Mental Health ("OMH")-licensed supported housing "before his eligibility for specialized services is confirmed by the appropriate providers and regulatory entities." Search for Change notes that Plaintiff

"requires continuing intensive support and supervision" which "require collaboration among various providers and disparate service systems."[13]

27.     Search for Change "remain[s] committed . . . to assisting Marek in achieving his goal of community placement and will continue to collaborate with WCDCMH and other entities in securing the services needed to implement his housing and support plan."

28.     Licensed Nursing Home Administrator Partyka stated that Plaintiff's "Needed Services included services that would be funded by New York State's Traumatic Brain Injury (TBI) Wa[i]ver."[14]

29.     Barry Dain–a health care administrator, employed at Sunshine Home Care in New York State–stated in his affidavit that "TBI Service Coordination, PBIS [Postive Behavioral Interventions and Supports], ILST [Independent Living Skills Training] and SDP [the Structured Day Program] are available services within the TBI Waiver Program."[15]

<u>TBI Waiver Program Services</u>

30.     The New York State Department of Health ("DOH") provides community-based services with Medicaid funds through its TBI Waiver Program.

31.     An individual applying to participate in the TBI Waiver Program must meet the following criteria:

---

[13]     (*Compare* Dkt. No. 83, Attach. 1, at ¶ 26 [Plf.'s Rule 7.1 Statement, citing portions of record establishing above facts] *with* Dkt. No. 86, Attach. 5, at ¶ 26 [Defs. Rule 7.1 Response, failing to cite record evidence controverting above facts].)

[14]     (*Compare* Dkt. No. 83, Attach. 1, at ¶ 28 [Plf.'s Rule 7.1 Statement, citing portions of record establishing above fact] *with* Dkt. No. 86, Attach. 5, at ¶ 28 [Defs. Rule 7.1 Response, failing to cite record evidence controverting above fact].)

[15]     (*Compare* Dkt. No. 83, Attach. 1, at ¶ 29 [Plf.'s Rule 7.1 Statement, citing portions of record establishing above fact] *with* Dkt. No. 86, Attach. 5, at ¶ 29 [Defs. Rule 7.1 Response, failing to cite record evidence controverting above fact].)

(a)  be a recipient of Medicaid coverage that supports community-based long-term-care-services;

(b)  have a diagnosis of traumatic brain injury;

(c)  be between the ages of 18 and 64 upon application to the TBI Waiver Program;

(d)  be assessed to need a nursing home level of care as a direct result of the traumatic brain injury;

(e)  choose to participate in the TBI Waiver Program rather than reside in a nursing facility by signing the Freedom of Choice form, Application for Participation form and Service Coordination Selection form;

(f)  identify the residence in which the waiver participant will be living when receiving TBI Waiver Program services;

(g)  complete an Initial Service Plan and Application Packet in cooperation with a Service Coordinator and be approved by the RRDS; and

(h)  have a completed Plan for Protective Oversight.[16]

32.  Plaintiff is a recipient of New York State Medicaid.

33.  He has a diagnosis of traumatic brain injury.

34.  He is 43 years old and is therefore between the ages of 18 and 64.

35.  In his affidavit dated January 14, 2015, Plaintiff states that he "would accept residential housing supports from Search for Change of Westchester County if they are offered to me."[17]

---

[16]  (Dkt. No. 83, Attach. 17, at 3 [attaching Section II of Ex. N to Waters Decl.].)

[17]  (*Compare* Dkt. No. 83, Attach. 1, at ¶ 37 [Plf.'s Rule 7.1 Statement, citing portion of record establishing above facts] *with* Dkt. No. 86, Attach. 5, at ¶ 37 [Defs. Rule 7.1 Response, failing to cite record evidence controverting above facts].)

36.     Also in his affidavit, Plaintiff states that he wants to develop a service plan with Barry Dain, or a similar service coordination agency that will support him safely living in the community.

37.     Plaintiff was admitted to HRC on or about September 18, 2009. The payor source for the care that Plaintiff receives at HRC is New York State Medicaid. New York State contracts with HRC to provide skilled nursing services.[18]

38.     New York State has not created a discharge plan from HRC for Plaintiff, and its position is that it is not required to do so.

39.     HRC has sought and applied for New York State programs that are necessary for Plaintiff to safely be discharged from HRC.

40.     Licensed Nursing Home Administrator Partyka stated that "HRC was . . . informed that the New York State Medicaid program would not pay for the Needed Services."[19]

41.     Licensed Nursing Home Administrator Partyka stated that "New York State has failed to indicate any willingness to pay for the community-based mental health housing and community-based TBI service that Plaintiff's treatment professional have determined as necessary for a safe discharge."[20]

---

[18]     (*Compare* Dkt. No. 83, Attach. 1, at ¶ 39 [Plf.'s Rule 7.1 Statement, citing portions of record establishing above facts] *with* Dkt. No. 86, Attach. 5, at ¶ 39 [Defs. Rule 7.1 Response, failing to cite record evidence controverting above facts].)

[19]     (*Compare* Dkt. No. 83, Attach. 1, at ¶ 42 [Plf.'s Rule 7.1 Statement, citing portions of record establishing above facts] *with* Dkt. No. 86, Attach. 5, at ¶ 42 [Defs. Rule 7.1 Response, failing to cite record evidence controverting above facts].)

[20]     (*Compare* Dkt. No. 83, Attach. 1, at ¶ 44 [Plf.'s Rule 7.1 Statement, citing portions of record establishing above facts] *with* Dkt. No. 86, Attach. 5, at ¶ 44 [Defs. Rule 7.1 Response, failing to cite record evidence controverting above facts].)

42.     In New York State's Olmstead Plan, DOH has committed to reduce the long-stay population in nursing homes. Long-stay is defined as residence in a nursing facility for ninety days or longer for other than rehabilitative purposes.

43.     New York State's Olmstead Plan promises to assist in transitioning people with disabilities into the community from nursing homes.

44.     New York State has a number of policies to support community living for people with disabilities residing in nursing homes, including the TBI Waiver Program. This program provides access to community-based supports for people who meet the criteria for nursing home level of care.[21]

## 2.     Statement of Material Facts Relevant to Defendants' Cross-Motion

Generally, the following statements of fact are asserted and supported by a specific record citation in Defendants' Statement of Material Facts ("Rule 7.1 Statement") and not denied with a specific record citation in Plaintiff's response thereto ("Rule 7.1 Response").

1.     Plaintiff suffered a traumatic brain injury at the age of 17.

2.     In addition to his traumatic brain injury, Plaintiff is diagnosed with the following Axis I mental health disorders: schizoaffective disorder, obsessive compulsive disorder, polysubstance abuse, and bipolar disorder and an Axis II diagnosis of R/O Mixed Personality Disorder.

---

[21]     The Court notes that the fact asserted in Paragraph Number 49 of Plaintiff's Statement of Material Facts (i.e., that "Providing Mr. Ross services as detailed in the *Proposed Plan for Marek Ross upon Discharge from Holyoke Rehabilitation Center* would not constitute a fundamental alteration to the programs of the state defendants") is inadmissible for the following two reasons: (1) it relies on Defendants' response to Plaintiff's Request for Admissions, which the Court finds to be unenforceable for the reasons stated below in Part III.B. of this Decision and Order; and (2) it was a statement made during settlement negotiations, in violation of Fed. R. Evid. 408(a).  In the alternative, the Court finds this "fact" is an impermissible legal conclusion.

3. Plaintiff participated in DOH's Home and Community Based Services ("HCBS") TBI Waiver Program from May 5, 2009, to September 18, 2009.

4. During his participation at that time, there were 13 Serious Reportable Incidents, including: June 15, 2009 (threats to kill staff), June 28, 2009 (suicidal ideations), July 6, 2009 (assault on staff), July 19, 2009 (elopement from staff), July 25, 2009 (threats to harm himself), August 5, 2009 (suicidal thoughts), August 24, 2009 (allegation of being discovered in a bush with a ten year old girl).[22]

5. The incidents of June 28, 2009, and July 6, 2009, resulted in hospitalizations, and psychiatric evaluations were conducted.

6. In its evaluation of crisis lethality, the report of June 28, 2009, noted that Plaintiff stated that "he is feeling suicidal with a plan to overdose on his medications or to shoot himself with a gun." It also outlined his admission of past suicidal attempts: "OD, jumping out of a 2nd story window, smashing 20 bottles over his head then cutting himself requiring several sutures in several areas."

7. The report of July 6, 2009, which followed an assault on staff, noted that "Patient has a significant history of assaultive behavior," that he assaulted and injured a staff person from his TBI Program on this date," and that "Patient also required restraint in the AMC [Albany Medical Center] ER [Emergency Room] secondary to assaultive behavior."

8. The report noted also that Plaintiff self-reported himself as "psychotic," has "infrequent auditory hallucinations in the form of a voice calling his name," and "gets repetitive

---

[22] (*Compare* Dkt. No. 86, Attach. 6, at ¶ 4 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citations] *with* Dkt. No. 88, Attach. 8, at ¶ 4 [Plf.'s Rule 7.1 Response, denying fact but failing to support denial with accurate record citation].)

thoughts in his head that he cannot get rid of, such as '69,000 murders,' 'a million murders,' and 'repetitive sexual thoughts.'"

9. The report, dated July 6, 2009, concluded that inpatient treatment was required "to keep others safe, to promote stabilization, and to provide opportunity for medication intervention."

10. On September 1, 2009, Plaintiff was evicted from his apartment.

11. On August 28, 2009, Plaintiff was informed that he was being discharged from the TBI Waiver Program effective September 11, 2009, because his needs exceeded the program's ability to safely serve him.

12. On September 9, 2009, Maria Relyea, the RRDS for the RRDC, met with Plaintiff and the clinical team to discuss the fact that Plaintiff needed a higher level of care to address and stabilize his psychiatric needs, as he was at risk to himself and others; Plaintiff "willingly went inpatient on 9/18/09."

13. On September 18, 2009, Plaintiff was formally discontinued from the TBI Waiver Program due to his admission to a Residential Care Facility.

14. Plaintiff did not request a Fair Hearing to challenge this decision.

15. On or about April, 2011, Plaintiff applied for HCBS-TBI services through the Syracuse Region RRDC.

16. As part of the review of Plaintiff's application, the RRDS requested and received a summary from Plaintiff's psychiatrist at HRC, Anthony Joseph, M.D.

17. On August 8, 2011, Dr. Joseph noted that Plaintiff's mental status could vary widely and that "when doing optimally, he can be engaged, appropriate, functional" and when decompensated he "can be extremely manic, agitated, assaultive, and out of control" as well as

"actively suicidal and homicidal."[23]

18.  A request was also made for the New York State Neurobehavioral Project to assess Plaintiff for behavioral concerns in the community.

19.  This assessment, dated May 24, 2011, observed that, "[i]n absence of intensive mental health supports the probability that Mr. Ross will be able to maintain positive behaviors in the community is very low."

20.  The summary, dated May 24, 2011, concluded as follows: "In the absence of constant, careful, and consistent monitoring by staff, intensive clinical mental health services provided in concert with behavioral treatment, and a tightly controlled daily routine, Mr. Ross will likely present a significant risk to his own health and safety."

21.  On October 27, 2011, the Syracuse Region RRDS determined that the TBI Waiver Program was not appropriate for Plaintiff, because the program could not support the individual's health and welfare in the community given that the TBI Waiver Program "does not have the intensive supports needed to meet the challenges that Mr. Ross faces in his struggle with mental health issues."

22.  Also on October 27, 2011, the RRDS found that the TBI Waiver Program was not able to ensure the safety of Plaintiff or the safety of others, and asserted that Plaintiff would be better suited in a program that can meet his mental health needs with trained professional staffing suited to address mental health concerns and crises.

---

[23]    (*Compare* Dkt. No. 86, Attach. 6, at ¶ 17 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 88, Attach. 8, at ¶ 17 [Plf.'s Rule 7.1 Response, failing to cite record evidence controverting above facts].)

23.     During the hearing on October 27, 2011, the RRDS provided information regarding community-based programs that serve the mental health population in 24/7-staffed supportive apartments.

24.     Plaintiff requested a fair hearing pursuant to 18 NYCRR Part 358 to challenge the RRDS determination.

25.     The agency's determination to deny Plaintiff's request to participate in the Syracuse Region TBI Waiver Program was upheld, following a Fair Hearing, in a decision dated March 12, 2012, on the ground that "the Appellant's needs cannot be met in this program."[24]

26.     In October of 2013, the Lower Hudson Valley RRDC ("LHV RRDC") conducted an assessment of Plaintiff to determine his eligibility for the TBI Waiver Program and the LHV RRDC.

27.     The LHV RRDS denied Plaintiff's enrollment "due to [its] not being able to maintain Marek's health and welfare."

28.     The RRDS recommended that Plaintiff seek a Mental Health living arrangement which would "provide 24 hour staffing/oversight, medication oversight, and individual and group therapy for anger management and sexual appropriateness," and further recommended that an "extreme structured environment and program" be established in advance of Plaintiff's in-patient discharge.

---

[24]     The Court notes that the fact asserted in Paragraph Number 26 of Defendants' Statement of Material Facts (i.e., that "On or about May, 2013 DOH offered to place Mr. Ross at Northeast Center for Rehabilitation and Brain Injury, (Northeast) located in Lake Katrine, NY, as a possible transition to the community, but plaintiff rejected this placement") is inadmissible because the evidence presumably intended to be cited by Plaintiff in support of that fact (i.e., Paragraph 52 of Kosinski Declaration) was a statement made during settlement negotiations, in violation of Fed. R. Evid. 408(a).

29.     In early 2014, Plaintiff applied to Westchester's Single Point of Access/ Accountability ("SPOA") program for housing and OMH services.

30.     On October 7, 2014, Search for Change, a SPOA provider, evaluated Plaintiff.

31.     Search for Change stated that it would not admit Plaintiff to OMH-licensed supported housing "before his eligibility for specialized services is confirmed by the appropriate providers and regulatory entities."[25]

32.     In its evaluation, Search for Change indicated that Plaintiff would otherwise be eligible, if he were simultaneously receiving TBI Waiver Program services (citing 20 hours of PBIS and 35-40 hours of HCBS).

33.     On December 15, 2014, the Westchester Independent Living Center, the Lower Hudson Valley RRDC, reevaluated Plaintiff for the TBI Waiver Program, considering that Plaintiff would have Mental Health housing and services through Search for Change.

34.     During the interview on December 15, 2014, Plaintiff stated that he did not desire to live in the mental health home available through Search for Change because it was for the "mentally ill."[26]

35.     Before the interview, RRDS Howard was provided with a Progress Note dated October 24, 2014, authored by Christy Banish, an HRC Social Worker who was also present during the interview; that progress note recorded a conversation she had with Plaintiff on

---

[25]     (*Compare* Dkt. No. 86, Attach. 6, at ¶ 32 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 88, Attach. 8, at ¶ 32 [Plf.'s Rule 7.1 Response, failing to cite record evidence controverting above fact].)

[26]     (*Compare* Dkt. No. 86, Attach. 6, at ¶ 35 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 88, Attach. 8, at ¶ 35 [Plf.'s Rule 7.1 Response, denying fact but failing to support denial with accurate record citation].)

October 22, 2014, in which Plaintiff stated that he does not wish to live in the house he toured through Search for Change because the people who live there looked mentally ill.

36. Based upon all the current information considered, both verbal and written, the RRDS concluded that, in his current condition, Plaintiff cannot be safely served by the TBI Waiver Program in a community setting and that "a non-medical, voluntary community based program such as the NYS TBI Waiver Program would not be the appropriate transition program for Mr. Ross."

37. In reaching this conclusion, the RRDS cited some of Plaintiff's recent behaviors while he was at HRC, a secured facility with 24-hour care, which could put Plaintiff and/or others in the facility and in the community at risk.

38. According to the RRDS, these behaviors included the following: (a) a recent incident in which Plaintiff attacked his roommate; (b) an inappropriate sexual encounter with a resident, (c) Plaintiff's admission that he has a "sexual addiction" which he indicated can be addressed if he were to "Play with myself so I don't hurt anyone else"; and (d) an incident with Ashley Baylor, newscaster for Massachusetts News Center 22, in which Plaintiff called Ms. Baylor to find out about an email he sent her. Although Plaintiff stated that no further contact was made, the News Center contacted HRC and made a complaint against "a resident calling with inappropriate request of the newscaster" on many occasions.[27]

39. On January 7, 2015, a Notice of Decision was issued, stating that the reason for denial was "the services and supports available through the [TBI Waiver Program] are not sufficient to maintain the individual's health and welfare in the community."

---

[27] (*Compare* Dkt. No. 86, Attach. 6, at ¶ 37 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 88, Attach. 8, at ¶ 37 [Plf.'s Rule 7.1 Response, denying fact in part, but failing to support denial with accurate record citation].)

40. Plaintiff requested a fair hearing.

41. The fair hearing was scheduled for February 6, 2015; however, Plaintiff "requested and was granted an adjournment . . . from the February 6, 2015 hearing date. A new hearing date has not been assigned."

## II. GOVERNING LEGAL STANDARDS

### A. Standard Governing Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply

show that there is some metaphysical doubt as to the material facts" [citations omitted].

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that nonmoving party is proceeding *pro se*.[28] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[29] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[30] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has willfully failed to properly respond to that statement[31]–even where the nonmoving party was proceeding *pro se* in a civil rights case.[32]

---

[28] *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[29] *Cusamano*, 604 F. Supp.2d at 426 & n.3 (citing cases). The Court notes that Plaintiff was served with such a notice in this case. (Dkt. No. 63, Attach. 14.)

[30] *Cusamano*, 604 F. Supp.2d at 426-27 & n.4 (citing cases).

[31] Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[32] *Cusamano*, 604 F. Supp.2d at 427 & n.6 (citing cases).

Similarly, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in a properly filed memorandum of law (submitted in support of a motion for summary judgment), the movant's burden with regard to that argument is lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & nn.2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases). Again, this rule applies even to *pro se* litigants, especially ones who have received notice of the consequence of that failure to respond.[33]

### B. Standards Governing Plaintiff's Claims and Defendants' Defenses

Because the parties have (in their memoranda of law) accurately recited the legal standards governing Plaintiff's claims and Defendants' defenses, the Court will not repeat those legal standards in their entirety in this Decision and Order, which (again) is intended primarily

---

[33] Alternatively, the court can deem the challenged claim abandoned (regardless of the facial merit of the unresponded-to argument). *See Jackson v. Fed. Exp.*, No. 12-1475, 2014 WL 4412333, at *6 (2d Cir. 2014) ("Where a partial response to a motion is made– i.e., referencing some claims or defenses but not others–a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned. In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review. This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

for the review of the parties. Rather, the Court will merely cite portions of those legal standards where necessary below in Part III of this Decision and Order.

## III. ANALYSIS

### A. Analysis of Plaintiff's Motion for Summary Judgment

After carefully considering the matter, Plaintiff's motion for summary judgment is denied for the reasons stated in Defendants' opposition memorandum of law and each of the reasons stated below. *See, supra,* Parts I.C. and III.B. of this Decision and Order.

### B. Analysis of Defendants' Cross-Motion for Summary Judgment

After carefully considering the matter, Defendants' cross-motion for summary judgment is granted for the reasons stated in Defendants' memorandum of law. *See, supra,* Part I.C. of this Decision and Order. To those reasons, the Court adds only three points.

First, the Court concludes that Plaintiff's Requests for Admission are unenforceable for each of the two alternative reasons set forth in Defendants' opposition memorandum of law: (1) Plaintiff's service of the requests was untimely and was not rendered timely by subsequent orders; and/or (2) the requests improperly sought the admission of the case's fundamental legal issues. The Court notes that, in support of this second reason, the Court relies on three cases.[34]

---

[34] *See Lakehead Pipe Line Co. v. Am. Home Assur. Co.*, 177 F.R.D. 454, 458 (D. Minn. 1997) ("[B]y several of their Requests, the Defendants seek to have the Plaintiffs ratify what are, in essence, the legal conclusions that the Defendants have attached to the operative facts of the case. Of course, requests for admission are not to be employed as a means to establish facts which are obviously in dispute or to answer questions of law. . . . Accordingly, a request for admission which involves a pure matter of law, that is, requests for admissions of law which are related to the facts of the case, are considered to be inappropriate.") (internal citations and quotation marks omitted); *accord, Michel v. WM Healthcare Solutions, Inc.*, 10-CV-0638, 2011 U.S. Dist. LEXIS 140177, at *9 (S.D. Ohio Dec. 6, 2011); *Music Group Macao Commer. Offshore, Ltd. v. Foote*, 14-CV-3078, 2015 U.S. Dist. LEXIS 16743, at *5 (N.D. Cal. Feb. 10, 2015).

Moreover, as yet a third alternative reason for concluding that Requests for Admission are unenforceable, the Court finds that admitting the facts in question would work a substantial injustice under the circumstances, which included, at the very least, reasonable confusion regarding the orders following the service of the requests, and no real prejudice to Plaintiff.[35]

Second, the Court agrees with Defendants that Plaintiff's first four claims (under the ADA and Rehabilitation Act), which are largely redundant, are not supported by a showing that there has been an unjustified segregation or isolation of an individual because of a disability. The Court renders this finding for each of the three alternative reasons stated by Defendants: (1) New York State's treatment professionals have not determined that the placement in question is appropriate for Plaintiff; (2) when reevaluated for the TBI Waiver Program, Plaintiff opposed the treatment plan; and (3) placement cannot be reasonably accommodated, taking into account the resources available to New York State and the needs of others with mental disabilities.

Third, and finally, because Plaintiff does not oppose the dismissal of his fifth and sixth claims (for the denial of due process), and indeed mentions the "withdrawal" of those claims, Defendants' burden on their Eleventh Amendment immunity argument is lightened such that, in order to succeed on that argument, they need show only that the argument possesses facial merit, which they have done. *See, supra,* Parts I.C. and II.A. of this Decision and Order. In the alternative, these two claims are dismissed as barred by the availability of an Article 78 proceeding, regardless of whether Plaintiff has conceded that Article 78 argument.

---

[35]    *See Rivers Elec. Co., Inc. v. 4.6 Acres of Land*, 89-CV-0442, 1991 U.S. Dist. LEXIS 17137, at *10-11 (N.D.N.Y. Nov. 22, 1991) (McCurn, C.J.) (explaining that, under Fed. R. Civ. P. 36, a party who failed to deny requests for admissions has not automatically admitted them if doing so would constitute a detriment to substantial justice); *accord, Williams v. Krieger*, 61 F.R.D. 142, 144 (S.D.N.Y. 1973) ("[I]t is true that failure to deny is tantamount to an admission, but it is equally true under this rule as under the others, that technical considerations will not be allowed to prevail to the detriment of substantial justice.") (quotation marks omitted).

For all of these reasons, Defendants' cross-motion is granted.

**ACCORDINGLY**, it is

**ORDERED** that, as directed in note 1 of this Decision and Order, the Clerk of the Court shall substitute New York State Department of Health Acting Commissioner Howard Zucker for New York State Department of Health Commissioner Nirav Shah on the docket sheet; and it is further

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 83) is **<u>DENIED</u>**; and it is further

**ORDERED** that Defendants' cross-motion for summary judgment (Dkt. No. 86) is **<u>GRANTED</u>**. Plaintiff's complaint is dismissed. The Clerk of the Court is directed to enter judgment in favor of the Defendants and close this case.

Dated: August 5, 2015
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge